

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

EDP/JN
*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 17, 2017

**By ECF and Hand Delivery**

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ryan Quashie
                Criminal Docket No. 14-376 (S-2) (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter in response to the defendant Ryan Quashie's November 23, 2016 submission to the Probation Department, see ECF Document Entry No. 190 (hereinafter "Def. Obj."), in which he raises several objections to the Presentence Investigation Report ("PSR"). As discussed below, the government disputes the defendant's objections and concurs with the assessments made by the Probation Department in the PSR.

I.    The Advisory Guidelines

      First, the defendant objects to the use of acquitted conduct to calculate his advisory Guidelines range in the PSR. See Def. Obj. at ¶¶ 1-2. The government agrees with the Probation Department that the defendant should be held accountable for his conduct in the Purves Street robbery and the use of firearms during both the Purves Street robbery and the robbery of Elaine Mikelatos (the "Mermaids robbery"), as was charged in Counts Two and Four of the Superseding Information, respectively. While the jury acquitted the defendant of Counts Two and Four, the government submits that the evidence presented at trial was sufficient to establish by a preponderance of the evidence that the defendant participated in the Purves street robbery, and that firearms were used in connection with both the Purves Street robbery and the Mermaids robbery.

      Under the Sentencing Guidelines, the Court must consider all relevant conduct whether or not it resulted in a conviction. See U.S.S.G. § 1B1.3. It is well-settled that charges that do not result in a conviction, including even acquitted conduct, can be taken into account at

sentencing. See United States v. Watts, 519 U.S. 148, 149-57 (1997); United States v. Massino, 546 F.3d 123, 135 (2d Cir. 2008); Nichols v. United States, 511 U.S. 738, 747 (1994); United States v. Singh, 390 F.3d 168, 191 (2d Cir. 2004). Notably, in Watts, the Supreme Court held that sentencing courts have broad discretion in considering various kinds of information, and the jury cannot be said to have "necessarily rejected" any facts when it returns a verdict of not guilty. 519 U.S. at 150, 155 (internal quotations omitted). The Watts Court highlighted "the significance of the different standards of proof that govern at trial and sentencing," explaining that "acquittal on criminal charges does not prove that the defendant is innocent, it merely proves the existence of a reasonable doubt as to [the defendant's] guilt." Id. at 155. Furthermore, "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." Id. at 152 (citing U.S.S.G. § 1B1.4).[1]

For the purpose of sentencing, the Court need only find the defendant's involvement in the Purves Street robbery and the use of firearms in the Purves Street and Mermaids robberies by a preponderance of the evidence – a standard clearly met here. The evidence presented by the government included, inter alia, the following:

- The victim of the robbery at Purves Street, Fabio Salazar, testified about both the robbery and his subsequent photo identification of all three robbers, including the defendant. The government admitted the photo array that Salazar used to identify the defendant just hours after the robbery, as well as corroborative testimony from Detective Raymond Brockmann concerning the photo identification.

- The government introduced into evidence the defendant's work telephone that was dropped during the robbery and subsequently recovered by Mr. Salazar hours after the robbers had left Mr. Salazar's apartment. Special Agent Vincent Noble presented an analysis of the calls made by the telephone prior to the robbery and showed that those calls were consistent with the defendant using the phone.

---

[1] Courts remain free, following United States v. Booker, 543 U.S. 220 (2005) and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), to rely upon acquitted conduct in their sentencing determinations. See United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after Booker, district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause"); see also United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) (concluding that after Booker, a district court may continue to make its own preponderance finding of a higher drug quantity than the amount found by the jury); United States v. Agostini, 365 F. Supp. 2d 530, 534 (S.D.N.Y. 2005) (quoting United States v. Crosby, 397 F.3d 103, 112 (2d Cir. 2005)).

Moreover, the government demonstrated that only the defendant's DNA was recovered on the dropped cell phone.

- The government presented the evidence of two cooperating witnesses who testified that the defendant committed the robbery with them. The government admitted voluminous additional evidence—including telephone records, documentary evidence, physical evidence and additional witness testimony (including testimony by Fernando Colon and Stephanie Wang)—to corroborate the cooperators' testimony about both robberies.

With respect to the gun charge, both Mr. Colon and Mr. Salazar testified that the robbers used a firearm during the robbery. Similarly, Ms. Mikelatos testified that the robbery crew carried a firearm when they robbed her and her daughters. Both cooperating witnesses also testified that they used firearms during both robberies. As the Court instructed the jury, there is no requirement that the defendant actually carry a weapon during the robbery so long as someone in the robbery crew carried a weapon and that it was reasonably foreseeable to the defendant that the robbery crew would do so.

In light of the forgoing, the government clearly established by a preponderance of the evidence that the defendant was guilty of committing the Purves Street robbery and was responsible for the use of weapons in connections with both the Purves Street robbery and the Mermaids robbery. Accordingly, this Court can and should consider those crimes as it crafts its sentence.

II.     The Adjustment in the PSR for Role in the Offense is Proper

Paragraph 39 of the PSR provides for a two-point role adjustment to the defendant's adjusted offense because the robbery crew impersonated cable repairmen in order to commit the Mermaids robbery. See Def. Obj. at ¶¶ 3-4. The defendant argues that the Guidelines do not provide for enhancements for those who impersonate cable repairmen as an abuse of a position of trust.[2] Id. Here too, the government agrees with the Probation Department that the two-point enhancement applies to the defendant's conduct because the use of the cable repairman ruse during the Mermaids robbery was both a use of a special skill and an abuse of a position of trust.

---

[2] Paragraph 39 of the PSR states that the robbery crew's use of the cable repairman ruse constituted both an abuse of trust and use of a special skill, either of which would justify a two-level enhancement under Section 3B1.3 of the Guidelines. The defendant objects to the PSR's conclusion that the robbers' use of the cable repairman ruse was an abuse of trust, but does not object that it constituted a special skill. For the reasons noted below, the defendant's use of the ruse qualifies under either theory.

A.  Special Skill

The United States Sentencing Guidelines observe that the term "special skill" refers to skills "not possessed by members of the general public and usually requiring substantial education, training or licensing." U.S.S.G. 3B1.3. This Circuit has stated that an enhancement for use of a special skill is "proper where the defendant's special skills increase[d] his chances of succeeding or of avoiding detection." United States v. Fritzson, 979 F.2d 21, 22 (2d Cir. 1992) (further noting that "[t]he fact that the same offenses could have been committed by a person without the defendant's special training is immaterial"). The purpose of this adjustment is "to add to the punishment of those who turn legitimate special skills to the perpetration of evil deeds." United States v. Mainard, 5 F.3d 404, 406 (9th Cir. 1993); see United States v. Aubin, 961 F.2d 980, 984 (1st Cir. 1992) (holding special skills enhancement appropriate where defendant used his knowledge as an ATM service repairman to organize and commit a robbery of an ATM machine); c.f. United States v. Turner, 272 F.3d 380, 390 (6th Cir. 2001), amended sub nom. United States v. James, 280 F.3d 1078 (6th Cir. 2002) (holding that use of status, training and education as police officers to effect a robbery qualified as a special skill).

The government submits that the defendant's conduct during the Mermaids robbery shows that he abused his special skills to accomplish his crime. The evidence at trial established that the defendant and his co-conspirators, Pacheco and Ercoli, robbed Ms. Mikelatos and her two small children by pretending to be responding to a cable repair appointment. At the time of the robbery, the defendant was an active cable repairman, while Pacheco had previously worked in a similar capacity.

To effectuate this plan, Pacheco and Ercoli physically cut the cable to the Mikelatos's house. Once the connection was severed, they notified the defendant, who, in turn, had an associate from a cable company inform him when the Mikelatoses had made a service call. Once the defendant and his co-conspirators learned that the call was made, the defendant had his friend, Samantha Slater, call the Mikelatoses from a blocked number to reschedule the repair visit so that the robbers could commit their crime.

On the day of the robbery, the defendant and his two accomplices approached the target home using repairman gear that the defendant—an active cable repairman—provided. They placed cones outside their van and dressed in cable repairman jackets that the defendant provided. The defendant then approached the house first, clipboard in hand, to complete the ruse. Once the defendant gained entry, the other co-conspirators followed suit and the robbery began.

Both Pacheco and Ercoli testified at trial that the robbers hatched this particular scheme only after they determined that they could not burglarize the victim's home. In other words, once the robbers realized that they could not gain entry to the victim's home using conventional means, they decided to use their special know-how as cable repairmen to create a ruse that would help them gain entry. By severing the victim's cable service, intercepting the cable repair call, disguising themselves with the defendant's equipment and gaining entry as cable repairmen, the robbers affirmatively used their special skills, knowledge and gear to effectuate the

crime. Accordingly, the Court should impose the two-level increase called for in the PSR. Fritzson, 979 F.2d at 22 (noting that the special skills enhancement is "proper where the defendant's special skills increase his chances of succeeding or of avoiding detection.").

B. Abuse of Trust

For the reasons noted above, the defendant and the other robbers employed special skills to effectuate the crime and avoid detection, thus warranting a two-level enhancement. The government also submits, however, that this same two-level enhancement could be found based on an abuse of trust.

Pursuant to Section 3B1.3 of the Guidelines, a defendant's adjusted offense level should be increased by two levels if the defendant "abused a position of public or private trust. . . that significantly facilitated the commission or concealment of the offense." Section 3B1.3. Here, the robbers used the cable repairman ruse because they knew that the victim would voluntarily invite them into her home if they pretended to be coming to repair her cable service. In so doing, they specifically preyed upon the trust that homeowners vest in individuals like cable repairmen, who cannot otherwise perform their duties unless admitted into the homes of their customers. Unlike a robber who sneaks through a victim's window or forces his way inside a victim's home through violence, the defendant accomplished his robberies by subterfuge—by abusing the trust that his victims placed in him.

The defendant's abuse of Ms. Mikelatos's trust to accomplish this crime warrants an abuse of trust enhancement. In United States v. Sierra, the Seventh Circuit assessed whether a police officer, Alex Sierra, had abused his position of trust as a police officer in committing a store robbery.[3] 188 F.3d 798 (7th Cir. 1999). In affirming the district court's imposition of the abuse of trust enhancement, the Court commented on the defendant's use of his privileged position to convince his victim to let him inside a store that he and his co-defendants subsequently robbed:

> We note that Sierra used his police badge to gain admission to the store that had just closed, an advantage that criminals of the non-police variety do not enjoy. "A police officer knows the power of [his] badge. Symbolizing the power of the state, a badge invests its possessor with control over people and access to places." United States v. Foreman, 926 F.2d 792, 795 (9th Cir. 1990). Without seeing the badge, it is unlikely that [the victim] would have unlocked his store and allowed the trio to enter. Thus, Sierra's use of his badge to gain admittance to the store he intended to rob, in itself, substantially facilitated his crime.

---

[3] The parties in Sierra conceded the uncontroversial point that a police officer holds a position of trust, citing earlier authorities.

As in the instant case, the victim in <u>Sierra</u> unlocked his door and voluntarily permitted three robbers to enter his private space because he trusted Sierra's uniform. And while the government readily concedes that a police officer and a cable repairperson are not analogous in the positions of trust they hold in society, the government submits that the similarities outweigh the differences: in each case, the robbers preyed on the expectation that the robbers' appearance and representations of authority would lead the victim to voluntarily permit the robbers' entry, thus enabling the robbers to commit the crime.[4] Accordingly, the Court should also find that the defendant abused a private trust in committing the charged robbery.[5]

---

[4] As is noted above, the enhancement concerns positions of both public <u>and private</u> trust; the relevant Guideline is not meant to apply solely to public officials like police officers. The commentary to the Guideline makes this clear: included among the examples discussed in the commentary which would violate a private trust is "the criminal sexual abuse of a patient by a physician under the guise of an examination." Section 3B1.3 cmt. 1. This example is illustrative: in such a situation, a patient gives a physician access to his/her person and the physician, in turn, uses that access to harm the patient. A crime committed in such a manner constitutes a violation of the trust that the patient reasonably extended to a physician, even if the physician was a private actor and not a public official.

[5] The fact that the defendant and the other robbers were not actually performing a legitimate cable repair appointment at the time of the robbery is of no issue. As is noted in the commentary to the Guidelines, the adjustment also applies to "persons who provide sufficient indicia to the victim that they legitimately hold a position of public or private trust when, in fact, they do not." 3B1.3 background. The Guidelines further add that individuals who pretend to hold such positions—as opposed to actually holding them—"generally are viewed as <u>more</u> culpable." <u>Id.</u> (emphasis added).

III.	Conclusion

For the reasons noted above, the government submits that the defendant's total offense level is properly calculated in the PSR as level 35 and criminal history category I, with an advisory range of imprisonment of 168 to 210 months.

                                  Respectfully submitted,

                                  ROBERT L. CAPERS
                                United States Attorney

By:   /s/
        Erik D. Paulsen
        Julia Nestor
        Assistant U.S. Attorneys


cc:	Cheryl Fiorillo, United States Probation Department (via Email)
      Kenneth Paul, Esq. (via Email)