

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

PT:EDP/JN
F. #2014R01473

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 27, 2017

By Hand and ECF

The Honorable Brian M. Cogan
United States District Court
Eastern District Of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Ryan Quashie
               Criminal Docket No. 14-376 (BMC)

Dear Judge Cogan:

On July 18, 2016, the defendant Ryan Quashie was convicted of Hobbs Act Robbery and Conspiracy to Commit Hobbs Act Robbery, in violation of 18 U.S.C. § 1951. The defendant is scheduled to be sentenced on February 3, 2017 at 10:00 a.m. For the reasons set forth below, the government submits that a Court should impose a considerable sentence that adequately reflects the violent and terrible acts committed by the defendant.

I.      Background

On February 22, 2016, and again on July 5, 2016, the defendant was tried by jury for his role in committing two Hobbs Act Robberies. During both trials, the government presented evidence showing that the defendant and his co-conspirators, Harry Pacheco and Diego Ercoli, committed two gunpoint robberies in July 2009 and January 2010, respectively. In the former robbery, the defendant and his co-conspirators robbed Fabio Salazar at gunpoint while pretending to be police officers (the "Purves robbery"); in the latter robbery, the defendant and his co-conspirators attempted to rob Eliane Mikelatos at gunpoint while pretending to be cable repairmen (the "Mermaids robbery"). During both trials, the government introduced evidence indicating that the defendant had committed numerous similar robberies with Pacheco and/or Ercoli both before and after the charged crimes. The first trial resulted in a mistrial; the second trial resulted in the defendant's conviction for Hobbs Act Robbery and Hobbs Act Robbery Conspiracy.[1]

---

[1] Because this Court conducted both trials, both of which featured several weeks of evidence, the government presumes the Court's familiarity with the underlying facts.

II.  Guidelines Calculation

In its October 25, 2016 Pre-Sentence Report ("PSR") and January 17, 2017 addendum, the Probation Department calculated the defendant's United States Sentencing Guidelines ("U.S.S.G.") adjusted offense level to be 35, resulting in a Guidelines range of 168-210 months.  For the reasons noted in the government's January 17, 2017 submission to the Court concerning the defendant's objections to the PSR,[2] the government concurs in this calculation, with one exception.  The PSR included three paragraphs that outlined the defendant's obstruction and noted that he warranted a two-level Guidelines enhancement based on his perjury.  (PSR ¶¶ 22-24).  The adjusted offense level in the PSR, however, did not include reference to that enhancement.  (PSR ¶¶ 34, 40).  The government recently advised both the Probation Department and defense counsel of this discrepancy and understands that the Probation Department will issue an addendum adjusting the calculation.  Accordingly, the government submits that the correct adjusted offense level should be 37, resulting in a Guidelines Range of 210-262 months.

III.  Legal Standard

In the Supreme Court's opinion in United States v. Booker, 125 S. Ct. 738, 743 (2005), which held that the Guidelines are advisory not mandatory, the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentence, but also may tailor the sentence in light of other statutory concerns.  See 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 128 S. Ct. at 596 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Id. at 596-97 (citation and footnote omitted).

It is well-settled that charges that do not result in a conviction, including even acquitted conduct, can be taken into account at sentencing.  See United States v. Watts, 519 U.S. 148, 149-57 (1997); United States v. Massino, 546 F.3d 123, 135 (2d Cir. 2008); Nichols v. United States, 511 U.S. 738, 747 (1994); United States v. Singh, 390 F.3d 168, 191 (2d Cir.

---

[2] In the January 17, 2017 letter, the government presented its argument for why the defendant merited a Guidelines enhancement for use of special skills and abuse of trust.  The government will not restate those arguments here.

2

2004).³  Furthermore, "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law." Id. at 152 (citing U.S.S.G. § 1B1.4).

IV. Argument

The defendant stands convicted of using violence and subterfuge to rob and steal from vulnerable individuals—behavior that warrants a severe sentence. The government will limit its arguments concerning that sentence to a few key points.

- First, the government submits that the nature of the Mermaids robbery justifies a sentence within the Guidelines. Put simply, the brutal conduct of the defendant and his co-defendants during the Mermaids robbery warrants a severe sentence, even without consideration of the defendant's other criminal conduct.

- Second, the government submits that the Court can and should consider acquitted conduct in calculating the Guidelines and formulating its sentence. Although the jury acquitted on the counts pertaining to the Purves street robbery and the defendant's use of a firearm, the government submits that it proved both counts by far more than a preponderance of the evidence. Accordingly, the Court should find that the defendant committed those additional crimes, and—as the Department of Probation did—adopt a Guidelines range that reflects that relevant conduct.

- Third, the government submits that the testimony given by Pacheco and Ercoli was credible, and therefore, the Court should consider the 404(b) evidence presented at trial as a 3553(a) factor in formulating its sentence.

- Fourth, and finally, the government submits that the Court should consider the defendant's blatant perjury during both trials when imposing sentence.

A. The Brutal Nature of the Mermaids Robbery Warrants a Considerable Sentence

Following the July 5, 2016 trial, the jury convicted the defendant of conspiracy to commit Hobbs Act Robbery and the attempted Hobbs Act Robbery of Ms. Mikelatos. Even on

---

³ Courts remain free, following Booker and Crosby, to rely upon acquitted conduct in their sentencing determinations. See United States v. Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after Booker, district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause"); see also United States v. Florez, 447 F.3d 145, 156 (2d Cir. 2006) (concluding that after Booker, a district court may continue to make its own preponderance finding of a higher drug quantity than the amount found by the jury); United States v. Agostini, 365 F. Supp. 2d 530, 534 (S.D.N.Y. 2005) (quoting Crosby, 397 F.3d at 112).

3

its own, the brutal nature of the Mermaids robbery—which involved a young woman and her two young children held at gunpoint—warrants a substantial sentence.

Ms. Mikelatos testified that one evening in January 2010, while she was home with her two young daughters, several men showed up at her house and claimed to be cable repairmen. (July Tr. at 53-60). The cable at Ms. Mikelatos's house had gone out several days earlier, and she was expecting cable repairmen to arrive. (Id.) The first person to enter was a tall African-American man (the defendant). (Id. at 53). He pretended to inspect her cable boxes and then let the other two men in. (Id. 53-56). The three men then held up Ms. Mikelatos and her two daughters at gunpoint, all the while demanding that she tell them where the safe was. (Tr. at 58).

Ms. Mikelatos told the jury in vivid detail how scared she and her daughters were during the robbery. (Id. at 59). She described the robbers screaming at her to keep her daughters quiet. (Id.) She testified how she repeatedly told the robbers to take whatever they wanted and that they did not have any money, but that the robbers refused to leave. (Id.) She described how her older daughter tried to run away during the commotion and that one of the robbers caught her daughter as she tried to escape. (Id.) Ms. Mikelatos further testified that the robbers brandished their guns and that her daughter wet herself from fright. (Id. at 60.)

Both Ercoli and Pacheco testified how they planned the robbery with the defendant and described the defendant's central role in the robbery. The defendant was the one that helped them get into the house by setting up the cable appointment so the robbers could employ their repairman ruse. (Id. at 231, 735-37.) The defendant provided the group with cable repairmen gear that they used to disguise themselves and gain entry to Ms. Mikelatos's home, (Id. at 239), and brought his friend "C-Rock" to serve as the lookout, (Id. at 234-35). Both cooperating witnesses generally corroborated Ms. Mikelatos's descriptions of the robbery, with Pacheco noting that Ms. Mikelatos and her family were "terrified." (Id. at 240.)

The jury convicted the defendant of committing this terrible robbery. The government submits that the defendant's participation in this robbery alone justifies a considerable sentence.

B. The Defendant's Acquitted Conduct Should Be Considered by the Court

Although the government submits that the defendant's conviction for the Mermaids robbery alone is sufficient to justify a severe sentence, the government presented the Court with considerable additional evidence that should inform the Court's decision—namely, the defendant's participation in the Purves street robbery and his use of firearms.

Although the defendant concedes that acquitted conduct may be considered by the Court at sentencing, the defendant suggests that there may be potential Sixth Amendment implications should the Court do so, citing several out-of-circuit opinions. This argument misstates the law. As the government noted in its January 17, 2017 letter to the Court, the law in this Circuit is clear that acquitted conduct may be considered by this Court at sentencing, and judicial fact-finding does not violate the Sixth Amendment when it results in the imposition of a sentence that does not exceed the statutory maximum for the offense of conviction. See e.g.,

4

Booker, 543 U.S. at 233 ("[W]hen a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant"); Vaughn, 430 F.3d 518, 527 (2d Cir. 2005) (holding that after Booker, district courts "may continue to find facts relevant to sentencing by a preponderance of the evidence . . . [and] may also continue to take into account acquitted conduct when sentencing defendants without violating the Due Process Clause").[4] The Supreme Court reaffirmed that principle in Cunningham v. California, 549 U.S. 270 (2007), finding "no disagreement among the Justices" that judicial fact-finding under the Sentencing Guidelines "would not implicate the Sixth Amendment" if the Guidelines were advisory, as they are in this case. Id. at 285.

Secondarily, the defendant states that his acquitted conduct and the 404(b) evidence should be ignored by the Court because, he argues, in acquitting the defendant of Counts Two (the Purves robbery) and Count Four (the gun charge in connection with both robberies), the jury failed to credit the cooperating witnesses. The Court should resist this invitation. As an initial matter, the Court need not and should not endeavor to guess why exactly the jury reached the verdict that it did. See e.g., Watts, 519 U.S. at 155-56 (noting that a jury cannot be said to have "necessarily rejected" any facts when it returns a verdict of not guilty, and an acquittal does not foreclose a sentencing court from finding the same conduct proved by a preponderance of the evidence). Rather, at sentencing the Court is tasked with independently evaluating the evidence presented by the government and determining whether that evidence proved, by a preponderance, that the conduct in question took place. Here, the government submits that the evidence presented of the defendant's commission of the Purves street robbery and his use of firearms was overwhelming. In regard to the Purves street robbery, that evidence included, among other things: the testimony of the victims of the robbery, Fabio Salazar and Fernando Colon; the identification of the defendant made by Salazar and corroborated by Detective Raymond Brockmann; the testimony of the two cooperating witnesses regarding both robberies; the discovery of the defendant's cellular telephone at the scene of the Purves robbery; the recovery of the defendant's DNA (and only the defendant's DNA) from the cellular phone; and the voluminous telephone toll evidence demonstrating that the defendant was at the site of the robbery the night it occurred. With regard to the use of firearms, every witness testified that firearms were overtly employed during both robberies. This testimony included the testimony of Ms. Mikelatos, the victim of the Mermaids robbery for which the defendant was convicted.

In summary, the evidence presented at trial was more than sufficient to find by preponderance of evidence that the defendant committed the Purves robbery and that the robbers carried guns during both robberies. Given the lower burden of proof at this juncture, the Court should hold the defendant responsible for the Purves street robbery and his use of firearms in determining the defendant's Guidelines range and crafting his sentence. See Watts, 519 U.S. at 155 (highlighting "the significance of the different standards of proof that govern at trial and sentencing," and explaining that "acquittal on criminal charges does not prove that the defendant

---

[4] In discussing the type of information that the sentencing court could consider under an advisory Guidelines regime, the Court in Booker drew no distinction between acquitted conduct and other relevant conduct. In fact, the Court cited Watts for the proposition that "a sentencing judge could rely for sentencing purposes upon a fact that a jury had found unproved (beyond a reasonable doubt)." Id. at 251.

5

is innocent, it merely proves the existence of a reasonable doubt as to [the defendant's] guilt" with respect to the charged crime).

C. The Defendant's History of Similar Robberies Should Militate in Favor of a Longer Sentence

The defendant's long history of committing similar crimes to the Purves and Mermaids robberies should also be a factor in determining his sentence. Pacheco testified at trial regarding his history of committing and attempting to commit robberies with the defendant. Pacheco testified that he and the defendant started committing robberies together back in 2000 when they first robbed a brothel in Manhattan. (July Tr. at 180). Pacheco testified that the two continued to commit robberies together and with others, including with Ewing (the lookout for the Purves robbery), "C-Rock" (the lookout for the Mermaids robbery) and Ercoli. (Id. at 180-93). Pacheco and the defendant also committed robberies together after the Purves and Mermaids robberies. (Id. at 191-93). During the course of this criminal activity, the defendant and his co-conspirators used similar ruses to obtain entry into people's homes, including dressing up as police officers and cable repairmen. (Id.) Needless to say, they used guns and violence in connection with these robberies as well, terrorizing individuals in the manner that they did during the charged conduct. (Id.)

The government submits that Pacheco and Ercoli's testimony about these additional robberies was both consistent and credible, and that the Court—in exercising its independent assessment of this evidence—should consider these additional crimes as it determines an appropriate sentence. This additional testimony portrays the defendant as someone willing and able to use violence and cunning to steal from individuals that he believed would not report his crimes to the police. Put simply, this testimony should provide the Court with a sense of the kind of person that the defendant truly is (in contrast to the letters submitted with his sentencing memorandum), and demonstrates that the defendant's criminal history score is woefully understated.

D. The Defendant's Sentence Should Be Enhanced Because of his Perjury

The defendant was tried twice for the conduct described above. During both trials, the defendant took the stand, testified and extensively perjured himself.[5] In addition to denying every aspect of his role in the numerous robberies he committed with Pacheco and Ercoli, the defendant also made numerous other statements that were contradicted by both the evidence and by common sense. These additional statements, which he needed to make in order

---

[5] The defendant's perjury appeared to be planned ahead of time. At the close of the government's case during the February 2016 trial, the defendant requested an adjournment so that he could consider whether or not to testify. Although the government did not formally object to the request for an adjournment, the government noted to the Court that the defendant's opening statement was replete with assertions that had not and could not be established without the defendant's testimony. Because the defense case so thoroughly depended on the defendant's testimony, the government submits that the defendant always intended to testify, and therefore that his perjury was both planned and premeditated.

to support the rest of his perjured testimony, included (but were not limited to) the following blatant lies and inaccuracies:

- In addition to denying that he had committed any robberies, the defendant testified that he had no idea that Pacheco had ever committed any other crimes. (Feb. Tr. at 1306, 1309-12; July Tr. at 1298). The defendant made this statement while acknowledging that Pacheco—a serial burglar and robber who had committed dozens upon dozens of crimes—was one of his closest friends for nearly twenty years, had a key to the defendant's house and essentially lived with the defendant while committing these crimes. (Feb. Tr. at 1240-42; July Tr. at 1290-91, 1366-70). Other witnesses, like Ercoli, testified that Pacheco did not hide his criminal activities; to the contrary, Ercoli learned Pacheco was a criminal during their very first meeting. (Feb. Tr. at 707; July Tr. at 706-07).

- The defendant testified that in or about April 2012, when Pacheco was seen on television news broadcasts following an FBI press release, the defendant confronted Pacheco about his criminality and ended their long friendship. (Feb. Tr. at 1276, 1306; July Tr. at 1292, 1345). The defendant, however, could not remember who provided him this information about Pacheco's presence on television (opining during the July trial that it may have been someone named "Frank"), nor could he remember any detail whatsoever about this important confrontation that ended his relationship with his good friend of twenty years. (Feb. Tr. at 1306, 1312-13; July Tr. at 1372-77). During the government's rebuttal case, FBI Special Agent Vince Noble presented telephone data showing that the defendant and Pacheco did not significantly change their telephone contact in 2012 until Pacheco's September 2012 arrest. This evidence confirmed Pacheco's testimony at trial that he and the defendant never had a falling out in April 2012, as the defendant testified on the stand. (July Tr. at 1473-79, 1496-502).

- Prior to the February trial, the Court had precluded the government from mentioning in front of the jury that the defendant and Pacheco were arrested and convicted of a marijuana offense in 2007. During his direct examination at the February trial, however, the defendant testified that he had never committed any crimes and that he had never committed any crimes with Pacheco. (Feb. Tr. at 1289, 1291-99). Following this misstatement, the Court permitted the jury to hear about the arrest and conviction.

- To explain his telephone's appearance in Fabio Salazar's apartment, the defendant claimed that he had permitted Pacheco to use his work phone outside of his presence, that Pacheco had improperly borrowed the telephone and that Pacheco had then told the defendant that he (Pacheco) had inadvertently left the telephone in a cab—failing to mention, of course, that it was dropped in a robbery and that the police would surely come knocking on the defendant's door. (Feb. Tr. at 1254, 1266, 1329; July Tr. at 1279, 1319-20). When asked on cross examination why he didn't simply call the

7

telephone that Pacheco allegedly "lost" in order to locate it, the defendant claimed that he couldn't do so because he didn't know his own telephone number. (July Tr. at 1404-05).

- When confronted with his suspiciously-timed call to Sprint Customer Care at the moment that his phone was dropped in Salazar's apartment, the defendant claimed that he specifically recalled calling Sprint to either activate his phone or pay his bill—despite records indicating that his telephone did not need to be activated and that he did not pay his bill until several weeks later. (Feb. Tr. at 1376; July Tr. at 1323-24, 1334, 1344, 1416). This specific memory was in contrast to his complete inability to remember any of the hundreds of other calls discussed during the trial.

These misstatements were not outliers—they made up the core of the defendant's testimony.[6] In order to distance himself from both the crime scenes and his co-conspirators, the defendant told lie after lie to the Court and jury—often in ways that were directly disproven by documentary evidence (such as his statement that he and Pacheco ceased being in contact after April 2012). See United States v. Dunnigan, 507 U.S. 87, 94 (1993) ("For purposes of § 3C1.1, perjury is defined as giving 'false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'"). Given this absolutely egregious perjury, the defendant's Guidelines calculation must be adjusted to reflect

---

[6] During both the February and July trials, the defendant testified that he worked for Vision Pro between 2007 and 2012 and that he earned between $800 and $1000 a week in salary. (Feb. Tr. at 1226, 1234; July Tr. at 1274, 1280, 1284, 1347, 1384). As is noted in the PSR, however, the defendant did not pay taxes anywhere near that level during that time period. (PSR ¶ 91). For example, in 2009 and 2010 combined—the two-year period that included the Purves Street robbery and the Mermaids robbery—the defendant reported a total of $15,093 in income. (Id.). Accordingly, one of two things must be true: either the defendant was not employed to the degree that he testified (thereby adding to his perjury) or the defendant has consistently failed to pay taxes commensurate with his earnings. The government submits that the Court can also consider this information in crafting its sentence.

8

his obstruction of justice. Furthermore, the Court should consider the defendant's blatant perjury in crafting a sentence adequate to the defendant's terrible crimes.

Respectfully submitted,

ROBERT L. CAPERS
United States Attorney

By:  /s/
Erik D. Paulsen
Julia Nestor
Assistant U.S. Attorneys
(718) 254-6135/6297

Enclosures
Cc: Kenneth Paul, Esq. (by ECF and email)